J-S19030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: C.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.B., MOTHER | No. 1794 EDA 2015 |

Appeal from the Decree entered May 14, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No: 51-FN-388415-2009
CP-51-AP-0000054-2015

| | |
|---|---|
| IN THE INTEREST OF: X.S.B.-D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.B., MOTHER | No. 1795 EDA 2015 |

Appeal from the Decree entered May 14, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No: 51-FN-388415-2009
CP-51-AP-0000055-2015

| | |
|---|---|
| IN THE INTEREST OF: S.S.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.B., MOTHER | No. 1796 EDA 2015 |

Appeal from the Decree entered May 14, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No: 51-FN-388415-2009
CP-51-AP-0000056-2015

J-S19030-16

BEFORE: BENDER, P.J.E, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 13, 2016**

B.B. ("Mother") appeals from the decrees entered May 14, 2015, in the

Court of Common Pleas of Philadelphia County, which involuntarily

terminated her parental rights to her minor daughters, X.S.B.-D., born in

June of 2005; S.S.B., born in July of 2011; and C.B., born in February of

2014 (collectively, "the Children").[1, 2]  We affirm.

The trial court summarized the factual and procedural history of this

matter as follows.

> On April 26, 2013 [the Philadelphia Department of Human
> Services ("DHS")] received a General Protective Services ("GPS")
> Report alleging that Mother was under the influence of drugs
> while she was caring for her [c]hild, S.S.B.  Mother, when
> questioned by the police, acted belligerently and gave multiple
> addresses as her place of residence.  The [c]hild, S.S.B., was
> crying and hungry and lacked her immunizations.  Mother, who
> lacked appropriate housing, agreed to allow the [c]hild to be
> placed into the care of a [m]aternal [g]reat [a]unt, C.H.  Mother
> agreed to enter a drug treatment program.  On May 9, 2013, the
> [c]hild, S.S.B., was adjudicated [d]ependent on which date
> Mother's whereabouts were unknown.  On June 25, 2013,
> Mother received a court-ordered drug screen at the Clinical
> Evaluation Unit, ("CEU") which revealed that she tested positive
> for high levels of marijuana.  On July 29, 2013, . . . Mother
> began inpatient treatment at Gaudenzia Diagnostic Rehabilitation
> Center.  On October 16, 2013, Mother was successfully

---

[1] On March 12, 2015, the trial court entered decrees terminating the parental rights of the Children's unknown father or fathers.  No alleged father is a party to the instant appeal.

[2] We note that the certified record in this case was originally due on July 13, 2015.  However, this Court did not receive the record from the trial court until well past the due date, on October 29, 2015.  As a result, the briefing schedule in this matter was delayed by over three months.

- 2 -

discharged from treatment and stepped down to an intensive outpatient treatment program with the plan for her to attend Southwest Nu-Stop. On November 14, 2013, a Permanency Review Hearing was held at which time Mother was residing with an [u]ncle and the [c]hild[,] S.S.B[.,] was ordered to remain committed to DHS under the care of her [m]aternal [g]reat [a]unt, C.H.

On December 31, 2013, DHS received a Child Protective Services ("CPS") Report alleging Mother's [c]hild, X.S.B.-D., had been sexually abused by a maternal teenage cousin with whom she shared a bedroom. The [c]hild, X.S.B.-D., had exhibited changes in her behavior in school and at home where she had set fire to the bedroom where she had been sexually abused. This [c]hild was referred to Horsham Clinic due to her behavioral changes. The [c]hild had been in the care of the mother of her abuser following the death of her maternal grandmother, who was her legal custodian. Consequently, an OPC was obtained on December 31, 2013, and [c]hild, X.S.B.-D., was placed with [m]aternal [g]reat [a]unt, C.H. On January 10, 2014, the [c]hild was adjudicated [d]ependent.

[In February of] 2014, DHS received a GPS Report alleging that Mother had given birth to [the c]hild, C.B., . . . at Temple University Hospital. Mother had reportedly forgotten to provide a sample of her urine and appeared to have cognitive or developmental delays. On February 19, 2014, DHS visited Mother's home and determined that it was appropriate for her to care for her [c]hild, C.B. On February 20, 2014, DHS visited Mother's home and the [c]hild appeared to be safe. At that time, Mother agreed to have In-Home Protective Services ("IHPS") implemented in her home.

***

On April 2, 2014, DHS encountered Mother with her [c]hild, C.B.[,] in the home of the mother of the teenage child who had abused her [c]hild, X.S.B.-D. At that time DHS attempted to schedule an appointment to visit Mother's home, but she was uncooperative. DHS attempted to visit Mother's home on a number of occasions without success, as no one answered the door. DHS left a number of letters at Mother's residence requesting her to cooperate.

On April 16, 2014, following a supervised visit with the [c]hildren, X.S.B[.]-D[.] and S.S.B[.], at New Foundations, Mother refused to relinquish the [c]hildren to the foster parent. While the foster parent and New Foundation staff were trying to put the [c]hildren into [the] foster parent's car, Mother appeared very agitated and struck the foster parent in the face. Mother then grabbed one of the [c]hildren and boarded a departing SEPTA bus. New Foundations staff followed the bus and, with the assistance of the Philadelphia Police, was able to retrieve the [c]hild, who was returned to placement.

***

On May 14, 2014, DHS received a GPS [r]eport alleging that the [c]hild, C.B., had been home alone for an unknown length of time. Police [o]fficers responded to a call at the family home at approximately 7:15 A.M. but were unable to gain access to the home. At approximately 8:10 A.M. [p]olice [o]fficers responded to a second call at which time they encountered Mother sitting on the front steps of the home who told them that she was locked outside and that her [c]hild, C.B., was inside the home. Mother, who appeared to be under the influence of an unknown substance, was arrested for endangering the welfare of a child. Upon gaining entry to the home, the [c]hild, C.B., was found lying face down on a mattress on the floor. The child's diaper had not been changed for an extended period of time. Police [o]fficers transported the [c]hild, C.B.[,] to DHS. Subsequently, DHS obtained an OPC for [the c]hild[,] C.B.[,] and placed her in a foster home through New Foundations. On May 16, 2014, DHS referred Mother to [the Achieving Reunification Center].

On May 29, 2014, the [c]hild[,] C.B.[,] was adjudicated [d]ependent and committed to DHS. On that date, the [c]hildren[,] X.S.B[.]-D. and S.S.B.[,] were [o]rdered to remain committed to DHS. The [trial c]ourt referred Mother to CEU for a forthwith drug screen, dual diagnosis assessment and monitoring to include three (3) random drug screens prior to the next [c]ourt [h]earing. [The trial c]ourt ordered DHS to refer Mother for a parenting capacity evaluation. [The trial c]ourt further ordered that DHS explore a foster home where all of the [c]hildren could reside together. Finally, Mother's visits were suspended until she achieved compliance with drug and alcohol

treatment and mental health treatment. The identity of the fathers of the [c]hildren remained unknown to DHS.

Trial Court Opinion, 10/28/15, at 2-6.

On January 29, 2015, DHS filed petitions to terminate Mother's parental rights to the Children involuntarily. A termination hearing was held on March 12, 2015, during which the trial court heard the testimony of Community Umbrella Agency case manager, Latonya Saxon. In addition, Mother's counsel agreed to stipulate to the statements of facts attached to the termination petitions. N.T., 3/12/15, at 6. At the conclusion of the hearing, the court agreed to hold its decision in abeyance in order to provide Mother with the opportunity to relinquish her parental rights voluntarily. *Id.* at 18. Court reconvened on May 14, 2015, at which time it was determined that Mother had not relinquished her parental rights. Thus, the court entered its decrees terminating Mother's parental rights to the Children involuntarily. Mother timely filed notices of appeal on June 11, 2015, along with concise statements of errors complained of on appeal.

Mother now raises the following issues for our review.

1. Did the [t]rial [c]ourt err in terminating [Mother's] parental rights under Pa.C.S. Section 2511?

2. Did the [t]rial [c]ourt err in finding that termination of parental rights best served the [C]hildren's developmental, physical and emotional needs under sub-section 2511(b)?

3. Did the [t]rial [c]ourt err in changing the [C]hildren's goal to adoption?

Mother's brief at vi.[3]

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

---

[3] While Mother purports to challenge the trial court's decision to change the Children's permanency goals to adoption, it does not appear that Mother filed an appeal from the court's goal change orders. The "Statement of Orders in Question" in Mother's brief references only the termination decrees, and Mother attaches only the termination decrees to her brief. *See* Mother's brief at v. Mother's notices of appeal indicate that she is appealing from the termination decrees only, and do not mention goal change orders. The certified record on appeal includes only the Children's adoption proceedings, and does not include the Children's dependency proceedings. As a result, the record does not contain any goal change orders. Thus, we address only the decrees terminating Mother's parental rights.

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b).[4] We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[4] We note that the trial court concluded incorrectly that Mother's parental rights could be terminated as to X.S.B.-D. under Sections 2511(a)(5) and (a)(8). Both of these sections require that the subject child have "been removed from the care of the parent by the court or under a voluntary agreement with an agency" in order to be applicable. 23 Pa.C.S.A. § 2511(a)(5), (8). X.S.B.-D. was not in the care of Mother at the time DHS obtained its OPC, and thus she was not "removed from the care of the parent" as the statute requires. *See In re C.S.*, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (concluding that termination was inappropriate under Sections 2511(a)(5) and (8) "because the record reflects that C.S. was never in Appellant's care and, therefore, could not have been removed from his care.").

\*\*\*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that

cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the trial court found that Mother has demonstrated both an incapacity and refusal to parent the Children. Trial Court Opinion, 10/28/15, at 12. The court reasoned that Mother has failed to establish and maintain a relationship with the Children, and that her incarceration has left the Children without necessary parental care. *Id.* The court also concluded that Mother will not be able to resolve her "dependency issues" in the near future. *Id.* at 13.

Mother argues that DHS failed to prove that she has not remedied the conditions causing the Children's placement in foster care. Mother's brief at 3. Mother points out that she participated in visits with the Children prior to being incarcerated, and that she completed an inpatient drug and alcohol program. *Id.* at 2-3.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion. During the termination hearing, Community Umbrella Agency case manager, Latonya Saxon, testified that Mother was provided with several Family Service Plan objectives, including "[drug and alcohol], mental health, housing, and visitation."[5] N.T., 3/12/15, at 8. Concerning Mother's drug and alcohol objective, Ms. Saxon agreed that Mother completed an inpatient treatment program. *Id.* at 10. However, Mother "never followed up with recommendations" and relapsed. *Id.* at 10. Mother never completed a mental health program, and Mother currently lacks housing, because she is incarcerated. *Id.* Ms. Saxon noted that Mother lacked housing even prior to her incarceration.[6] *Id.*

Concerning Mother's visitation objective, Ms. Saxon testified that Mother's last visit with the Children took place on April 16, 2014.[7] *Id.* at 8.

---

[5] The transcript of the termination hearing indicates that Mother had a "DNA" objective, and that she participated in "DNA" treatment. It is clear that Ms. Saxon was referring to "D and A" treatment, meaning "drug and alcohol."

[6] Ms. Saxon explained that Mother was incarcerated on January 21, 2015, as a result of "[c]hild endangerment for the incident that happened with the youngest child, [C.B.]." N.T., 3/12/15, at 9, 11. As described, *supra*, Mother apparently locked herself out of her home while C.B. was left inside. *See* Petition for Involuntary Termination of Parental Rights (Statement of Facts Re: C.B.), 1/29/15, at ¶ y. Mother appeared to be under the influence of an unknown substance during this incident. *Id.*

[7] While Ms. Saxon testified that Mother's last visit with the Children took place on April 16, 2014, we note that C.B. was not removed from Mother's care until almost a month later, on May 14, 2014. *See* Petition for Involuntary Termination of Parental Rights (Statement of Facts Re: C.B.),

Mother's visits were already suspended at the time Ms. Saxon was assigned to this case in May of 2014, and Ms. Saxon agreed that "there has been absolutely no visits or contact from [M]other" since that time. *Id.* at 8, 14. Ms. Saxon later added that Mother left her a voicemail in June of 2014, but Mother did not include any contact information that would have allowed Ms. Saxon to call her back. *Id.* at 15. Mother never attended any court hearings. *Id.* at 15-16.

Accordingly, the record supports the conclusion of the trial court that Mother has demonstrated an incapacity and refusal to parent the Children. Moreover, Mother cannot, or will not, remedy her incapacity and refusal. Mother has failed to complete her Family Service Plan objectives, and she currently is incarcerated for an unknown length of time. In addition, as observed by the trial court, it does not appear that Mother has made any effort to maintain a relationship with the Children. While Mother was unable to see the Children in person after her visits were suspended, there was no testimony during the termination hearing that Mother attempted to maintain contact with the Children by sending cards or letters, or that Mother did anything in an effort to get her visits back. As this Court has emphasized, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *M.E.P.*, 825 A.2d at 1276 (citations omitted).

---

1/29/15, at ¶ aa. Mother's visits were suspended on May 29, 2014. *Id.* at ¶ cc.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

Here, the trial court concluded that terminating Mother's parental rights would best serve the needs and welfare of the Children. Trial Court Opinion, 10/28/15, at 15. The court noted that the Children are bonded with their foster mother, and refer to her as "mom." *Id.* In contrast, the court found that S.S.B. and C.B. have no bond with Mother. *Id.* With respect to X.S.B.-D., the court found that she has not lived with Mother for the majority of her life, and that she does not feel safe with Mother. *Id.* The court reasoned that the Children would not suffer irreparable harm if Mother's parental rights are terminated. *Id.* In response, Mother argues,

- 12 -

"the DHS worker [*sic*] testified that the [C]hildren do have a bond with their mother[,] but it is not a parental bond." Mother's brief at 5.

We again discern no abuse of discretion. Ms. Saxon acknowledged during the termination hearing that she has never seen the Children interact with Mother. N.T., 3/12/15, at 13. However, Ms. Saxon opined that there is no bond between Mother and the Children, and that the Children will not suffer irreparable harm if Mother's parental rights are terminated. *Id.* at 11, 13-14. With respect to S.S.B. and C.B., Ms. Saxon explained that they are "too young to understand what is actually going on." *Id.* at 13. With respect to X.S.B.-D., Ms. Saxon stated, "she is aware of what's going on, however, she has expressed that she -- in the past, she did not feel safe with Mom and that she is -- she feels very safe now, where she is, and that she would like to stay." *Id.* at 13-14. Ms. Saxon agreed that Mother has "never really cared for" X.S.B.-D., and that X.S.B.-D. spent the majority of her life living with a family member in Maryland. *Id.* at 14-15. Ms. Saxon noted that that the Children do not ask about Mother. *Id.* at 13. The Children are bonded with their pre-adoptive foster mother and refer to her as "mom." *Id.* at 7, 12.

Thus, the record confirms that it would best serve the needs and welfare of the Children to terminate Mother's parental rights. Contrary to Mother's argument on appeal, Ms. Saxon did not testify that the Children have any sort of a bond with her. Instead, Ms. Saxon opined that no bond

exists, due the young age of S.S.B. and C.B., and because X.S.B.-D. feels unsafe while in Mother's care. Ms. Saxon's conclusion is supported by the fact that Mother has had no contact with the Children since May of 2014, and the fact that the Children spent relatively little time in Mother's care even prior to the suspension of her visits. The trial court was well within its discretion when it accepted the testimony of Ms. Saxon, and concluded that the Children will not suffer irreparable harm if Mother's parental rights are terminated.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children, we affirm the decrees of the trial court pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2016